UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- x
RAY CORONA, ROBERT BISHOP, EDUARD :            04 Civ. 10074 (CSH)
OPRESCU, VICTOR SHIMMONS, RAY ANNIS, :
JACKY DEUS, FRANCIS MILLER, JOSEPH :
INGEGNERE, GARY MILLER, GEORGE :
KYRIAKIDES, PAUL UNRATH and :
JOHN O'HARA, :
                                                              :
                              Plaintiffs, :
                                                              :
              -against-                        :        MEMORANDUM OPINION
_____:              AND ORDER
HOTEL and ALLIED SERVICES UNION LOCAL :
758, NEW YORK HOTEL and MOTEL TRADES :
COUNCIL, and NEW YORK PALACE HOTEL, :
                                                              :
                              Defendants. :
-------------------------------------------------------------- x

HAIGHT, Senior District Judge:

        In this case arising under § 301 of the Labor Management Relations Act ("LMRA"), 29

U.S.C. § 185, plaintiffs are employees of a hotel and members of a labor union. Their complaint

alleges that the hotel harmed plaintiffs by breaching a collective bargaining agreement with the

union, and that the union breached its duty of fair representation of plaintiffs by failing to press a

grievance on their behalf. The case is now before the Court on the motions of the hotel and the

union to dismiss plaintiffs' claims against them, and plaintiffs' cross-motion to disqualify the union's

counsel. In prior orders I have stated my intention to decide plaintiffs' motion to disqualify the

union's counsel before addressing the substantive motions to dismiss. This opinion resolves the

disqualification motion.

## I.  BACKGROUND

        The twelve plaintiffs are employed as bellmen and doormen at defendant New York Palace

Hotel ("the Hotel"). They are members of defendant Hotel and Allied Services Union Local 758, a constituent local of defendant New York Hotel and Motel Trades Council (collectively "the Union"). The Hotel and the Union are parties to a collective bargaining agreement ("the CBA").

According to the complaint and the affidavits on these motions of plaintiffs Ray Corona, Victor Shimmons, and Robert Bishop, for many years in the hotel industry it has been expected that guests tip doormen and bellmen for their services. Corona says that "tips are usually a large part of my annual income as well as that for other doormen and bellmen." Affidavit, ¶ 7. In July 2004, the manner in which the Hotel evaluated the work practices and services of its doormen and bellmen changed materially, as the result of hotel quality grading performed by the American Automobile Association ("AAA"). Specifically, on the basis of examinations and checklist evaluations by its "Tourism Editors" of a hotel's service, decor, and amenities, the AAA bestows ratings expressed in a number of "Diamonds." Four-Diamond and Five-Diamond ratings are the highest the AAA can bestow upon a hotel,[1] and consequently are coveted by hotel owners and managers.

The AAA has apparently promulgated and distributed to hotel managers elaborate and detailed written "Standards of Service" by which hotel ratings are determined. Attached as Exhibit 1 to the Corona affidavit is a two page, single-spaced document captioned "Bell Staff Standards," divided into four categories of "Standards of Service" for "Bell staff check in," "Bell staff check out," "Door staff arrival," and "Door staff departure."[2] The standards of service have been accepted by the Hotel. The managers of the Hotel, in turn, have instructed the bellmen and doormen to comply strictly with each and every one of the standards, and subject the them to disciplinary

---

[1] The AAA's Diamond rating system is reminiscent of the Michelin Star ratings given to restaurants.

[2] Exhibit 1 has a third page of comparable single-spaced "Standards of Service" for "Bell captains." None of the three plaintiff affiants is a bell captain.

sanctions if they fail to comply.  The standards of service detail the services bellmen and doormen are expected to render to arriving or departing guests, the information they are to furnish about the hotel and its amenities, and the questions they are to ask about needed services and the guests' satisfaction levels.  The standards of service for each of the four designated activities instruct bellmen or doormen to use a guest's name "frequently ... (at least 3 times")[3].

In July 2004, the Hotel began evaluating and disciplining its bellmen and doormen, including the plaintiffs, using the AAA Five Diamond checklist.  On July 13, 2004, the Hotel issued Corona a formal disciplinary notice for failing to comply with the AAA Five Diamond checklist, including such infractions as "failing to use the guest's name three (3) times" and "failure to show the guest how to use a door bell."  Corona Aff., ¶ 14.  A disciplinary notice remains in a Hotel employee's file and is the first step in a process which can result in termination of employment.  *Id*., ¶ 11.  The disciplinary notice issued to Corona was not generated by a complaint by a real-world Hotel guest; Corona says without contradiction on the present record that "[t]he Hotel based its discipline against me on observations secretly made by evaluators or "spotters" who posed as hotel guests but who were actually employed by a company hired for this purpose.  The [*sic*] were paid to find fault with our work."  *Id*., ¶ 20.  Plaintiff Shimmons received a comparable disciplinary notice on July 20, 2004.  Shimmons Aff., ¶ 7.  Corona says that the Hotel "issued formal disciplinary notices to other doormen and bellmen for allegedly failing to perform their duties according to AAA Five-Diamond standards."  Corona Aff., ¶ 22.

Plaintiffs assert that adherence to the AAA Five-Diamond standards requires bellmen and doormen "to spend much more time with each arriving or departing guest which, in turn, reduces tips

---

[3]  This repeated invocation -- one is tempted to say "parroting" -- of a guest's name is also expected of a bell captain, whose standards of service provide: "Bell Captain uses guest name frequently at each interaction (at least 3 times')."

earned as the numbers of guests they can service are reduced." Affidavit of Steven M. Coren, plaintiffs' counsel, ¶ 5.[4]

Plaintiffs claim that the Hotel's imposition of the Five-Diamond standards constitutes a unilateral change by the employer of established work practices, to the detriment of the plaintiff-employees and in violation of the CBA. Plaintiffs also claim that the Union has breached its duty to fairly represent them in asserting that claim against the Hotel.

In defending against plaintiffs' claim of failure of fair representation, the Union is represented by the law firm of Pryor Cashman Sherman & Flynn LLP ("Pryor Cashman" or "the Firm"). This opinion is concerned solely with plaintiffs' motion to disqualify Pryor Cashman as counsel for the Union. The facts pertinent to that motion are agreed in part, but there are material differences.

Plaintiff Robert Bishop was a union delegate for the door and bell staff at the Hotel. In July 2004, Corona and three staff members told Bishop that the Hotel had issued disciplinary notices against them for failing to adhere to the work practices mandated by the AAA Five-Diamond standards. Bishop Aff., ¶¶ 1, 3-4. In Bishop's view, the Hotel's unilateral imposition of new terms and conditions of employment constituted a breach of the CBA. Bishop telephoned John Pasquale, the Local 785 business agent, and alerted him that the Hotel was issuing such disciplinary notices to union members. On July 14, 2004, Bishop, Corona, and other bellmen and doormen met with Pasquale. They asked Pasquale about the possibility of filing a grievance against the Hotel. Pasquale said that "he would investigate and respond to us." *Id.*, ¶ 5. Despite repeated follow-ups

---

[4] Corona, a bellman at the Hotel, says in his affidavit at ¶ 17 that the AAA Five-Diamond standards "requires me to spend 20-25 minutes with each guest. Prior to the Hotel's use of AAA Five-Diamond standards, I would spend 10 minutes with a guest." Presumably the asserted loss of income occasioned by a reduced number of tippers is not offset by increased tips from tippers suitably grateful for an increased level of personal service.

by Bishop and others, the Union made no response and took no action until August 13, 2004.  On

that date the Union sent a letter signed by Michael Simo, the Trades Council regional director, to

John Segreti, the general manager of the Hotel.  Corona Aff., Ex. 4.  Simo took the position  in that

letter that the Hotel's evaluation and disciplining of door and bell staff on the basis of the AAA Five-

Diamond standards and checklist violated the CBA and the National Labor Relations Act.  Simo's

letter demanded that "any implementation of the new policy be suspended immediately and any

discipline resulting therefrom be expunged and that all affected employees be made whole for any

losses."  The August 13 letter also called for production by the Hotel to the Union of pertinent

documents "as soon as possible, but in no event later than August 18, 2004."

All this is undisputed.  It is also common ground that on August 17, 2004, a meeting took

place at the Union's offices, attended by Corona, Bishop, union delegate Stephen Hickey, Pasquale,

Simo, and Joseph Farelli.  Farelli is an attorney.  He was then, and is now, an associate at Pryor

Cashman, which frequently represents the Union and union members in grievance and arbitration

proceedings against employees.

The parties' accounts of what transpired at the August 17 meeting and thereafter differ as to

conduct and nuance.  The differences focus upon Farelli: what he said, and what he did.

Farelli says in an affidavit at ¶ 3:

> On August 17, 2004, I happened to be at the HTC's offices[5] for a
> meeting when HTC Regional Director Michael Simo asked me to sit
> in on another meeting that he and John Pasquale, a Local 758
> business agent, were about to have with some of the plaintiffs in this
> action, including plaintiff Ray Corona.

According to Farelli, Simo explained to him the nature of the door and bell staff 's complaints.

---

[5] "HTC" refers to defendant New York Hotel and Trades Council, one of the two defendants
in the case that I refer to collectively as "the Union."

"Simo asked me to assist Pasquale in framing these workers [*sic*] complaints when Pasquale presents the complaints to the Hotel management officials." *Id*, ¶ 4. Farelli's affidavit then gives this account, at ¶¶ 5-6:

> 5. At the August 17, 2004 meeting, I listened to the workers' complaints and generally explained to Pasquale, with the workers present, the types of claims and arguments the Union defendants[6] may want to make when the complaints are presented to the Hotel for adjustment.

> 6. The meeting lasted approximately forty-five (45) minutes and this was the only time I ever met with the workers concerning the Hotel's implementation of the AAA checklist standards. Since the August 17 2004 meeting, I have had no communication with any of the bellmen and doormen employed at the Hotel. Except for this meeting and helping Pasquale draft a grievance form regarding the workers' complaints, I have had no further involvement in connection with the workers' complaints in this matter.

The grievance form to which Farelli refers in ¶ 6 of his affidavit appears as Ex. 2 to Corona's reply affidavit. The exhibit consists of four pages. The first page is a typed memorandum under the printed Pryor Cashman name. The memorandum is to Pasquale from Farelli, dated August 31, 2004, and captioned: "New York Palace Hotel: Unilateral Change in Bellman and Doorman Performance Standards." The body of Farelli's memorandum to Pasquale reads as follows:

> Enclosed is a mark up of your Grievance Report in connection with the above-referenced matter. Please review and make the suggested changes as indicated. Please then forward the revised Grievance Report to HTC Grievance Officer Andrea Saxe with a request for an emergency hearing.

> Please call me if you have any questions regarding this matter.

The remaining three pages of Ex. 2 comprise a printed "New York Hotel Trades Council Grievance

---

[6] The careful reader will have observed that as of the August 17, 2004 meeting, the Union had not yet achieved the status of "Union defendants." They were cast in that role when plaintiffs commenced this action against them for breach of their duty of fair representation.

Report" form on which the details were typed in by Union officers. The copy in the record is not entirely legible, but it appears to have been signed by Pasquale over the typed description "Submitted by," and signed by Simo on August 18, 2004 over the typed description "Approved By." The form contains a number of handwritten corrections and additions. These presumably represent Farelli's "mark up." Their general effect is to sharpen and strengthen the Grievance Report.

In their affidavits, Corona and Bishop give a substantially different account of the August 17 meeting. Corona's first affidavit says at ¶ 29:

> The Union representatives asserted that the Hotel had acted wrongly and in violation of federal statutes and the CBA, that the Five-Diamond Standards were not conditions of our employment when we were first hired by the Hotel and told us that the new work practices are not part of the CBA. *Farelli and Simo both recommended that the Union immediately file a grievance against the Hotel and demand an emergency hearing on the issue.*

(emphasis added). Bishop describes the events at the meeting in his affidavit at ¶ 8:

> Farelli took statements from each of us, presumably for preparing a grievance report. Farelli informed us that the Hotel had acted wrongly. Farelli was emphatic that the Hotel had violated Federal law and had breached the CBA. In my presence, Farelli recommended to Pasquale and Simo that the Union Defendants needed to immediately file grievances and seek an emergency hearing on these issues. Finally, Farelli and Simo told us that Farelli and his firm, Pryor Cashman, would serve as our counsel during the meeting.

Farelli filed his affidavit, quoted *supra*, as part of the Union's papers opposing plaintiffs' disqualification motion. In a reply affidavit, Corona commented on Farelli's account of the August 17 meeting. Corona says that the meeting lasted "almost two hours," Reply Affidavit ¶ 4, rather than the "approximately forty-five (45) minutes" stated by Farelli. According to Corona, Pasquale began the meeting by introducing Farelli "as the attorney who is going to represent me and the plaintiff employees in my and their grievances against the Hotel," as well as the attorney for the door and bell

staff. *Id.*, ¶ 5. Farelli explained his firm's role as attorneys to Bishop, Hickey and Corona, and then "proceeded to take statements" from all three employees, asking each of them "questions such as our prior work history, salary, record of any discipline, communications that we had concerning the Hotel's implementation of new work standards and our thoughts about the new work rules." *Id.* Corona confided his concerns to Farelli, including his "fears of potential termination for being disciplined by formal written warning for violating the new work rules," a personal concern that Bishop also described to Farelli. *Id.* ¶ 6. Farelli then asked Corona, Bishop and Hickey to "write out a list of new and additional work practices" being imposed by the Hotel. The three employees worked up the list and gave it to Farelli. *Id.* Corona attaches a copy of the list as Ex. 1 to his Reply Affidavit, a handwritten document of twenty lines focusing principally upon bellmen and specifying services to be rendered and information to be given to hotel guests. Corona's account of the meeting continues:

> Once we completed this list, Farelli examined it. Farelli then, with a copy of the collective bargaining agreement in hand, advised us that the Hotel's implementation of the new work rules was in violation of several provisions in the collective bargaining agreement. Farelli then told us that he would immediately file a grievance on our behalf.

*Id.* ¶ 7.

Of course, Farelli could not personally file a grievance on the employees' behalf. Under the CBA the Union files grievances on behalf of its members. As described *supra*, what Farelli did after the August 17 meeting was to "mark up" a Grievance Report prepared by Pasquale and Simo and forward it to Pasquale with his memorandum dated August 31, 2004, which recommended that Pasquale make Farelli's suggested changes and "then forward the revised Grievance Report to HTC Grievance Officer Andrea Saxe with a request for an emergency hearing." *Id.*

Plaintiffs filed this action against the Union because, despite Farelli's legal advice at the

August 17, 2004 meeting and his recommendation in the August 31 memorandum that the Union file a grievance and ask for an emergency hearing, the Union has never filed a grievance against the Hotel concerning the imposition of the AAA Five-Diamond standards upon the doormen and bellmen, or achieved the removal of the disciplinary notices from the personnel files of employees like Corona. The defendants' position, expressed in their papers on their motion to dismiss, is that they "have been engaged in ongoing negotiations regarding the bell and door staff," and that "the parties are not even at a stage where a grievance has been, or should be, filed." *See* affidavit of Ann Powers, the Hotel's personnel director, at ¶¶ 6-13.

The plaintiffs do not accept that position. They contend that the Union should have filed a grievance and sought an expedited hearing promptly upon receipt of Farelli's August 31 memorandum recommending precisely those steps. Plaintiffs say that the Hotel's continuing imposition of the disputed work standards is prejudicing them through reduced tip income and the presence of disciplinary notices in their personnel files. Plaintiffs have repeatedly pressed the Union to file a grievance, to no avail. The most recent effort took the form of a letter dated November 23, 2004 from plaintiffs' present counsel to the president of defendant Trades Council, requesting that "the Union forthwith file grievances regarding discipline issued and take such other steps as may be necessary to enforce the collective bargaining agreement," and advise plaintiffs' counsel of the Union's response "on or before Monday, November 29, 2004." Ex. 9 to plaintiffs' motion papers. The Union made no response. Plaintiffs filed their complaint dated December 17, 2004. The complaint alleges that the Hotel breached the collective bargaining agreement and the Union violated its duty of fair representation, and prays for relief appropriate to those claims.

The only issue addressed by this opinion is plaintiffs' motion to disqualify the Pryor Cashman Firm as the Union defendants' counsel.

## II.  DISCUSSION

### A.        The Nature of Plaintiffs' Underlying Claims

_____ I construe plaintiffs' complaint "as a hybrid claim under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, and the implied duty of fair representation under the National Labor Relations Act, 29 U.S.C. §§ 151-169."  *Sanozky v. International Association of Machinists and Aerospace Workers*, 415 F.3d 279, 281 (2d Cir. 2005).  In *Sanozky* the Second Circuit held:

> To prevail on a hybrid § 301/duty of fair representation claim, Sanozky [the plaintiff] must demonstrate both (1) that TWA [the employer] breached the collective bargaining agreement and (2) that IAMAW [the union] breached its duty of fair representation.  A union breaches the duty of fair representation when its conduct toward a member of the bargaining unit is arbitrary, discriminatory, or in bad faith.  A union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a wide range of reasonableness as to be irrational.

415 F.3d at 282-83 (citations and internal quotation marks omitted).  I apply these principles to the case at bar.

### B.        Plaintiffs' Motion to Disqualify Counsel for the Union Defendants

_____Plaintiffs urge two grounds for disqualifying Pryor Cashman as the Union's attorneys in this action: first, an inherent conflict of interest, since the Firm "had previously held itself out as counsel for plaintiffs and is now representing interests adverse to those of plaintiffs," Main Brief at p. 3; and second, the necessity of calling Farelli, an associate of the Firm, as a fact witness.

The Second Circuit has instructed that while "in disqualification matters we must be solicitous of a client's right freely to choose his counsel," that right "of course must be balanced against the need to maintain the highest standards of the profession."  *Government of India v. Cook Industries*, 569 F.2d 737, 739 (2d Cir. 1978).  Those standards are stated in the Code of Professional

Responsibility promulgated by the American Bar Association, as adopted by the New York State Bar Association. "The Code is recognized in this Circuit as prescribing appropriate guidelines for the professional conduct of the bar." *Gleason v. Zocco*, 941 F.Supp. 32, 35 (S.D.N.Y. 1996) (citing cases).

In the case at bar, plaintiffs' first asserted ground disqualifying Pryor Cashman as the Union's attorneys, conflict of interest, gives rise to certain complexities. But no uncertainties arise with respect to the second ground, plaintiffs' need to call Farelli as a fact witness. In the view I take of the case, I disqualify the Firm on that second ground and do not reach the first.

The Code is now set forth in Part 1200 of Title 22 of the New York Codes, Rules and Regulations ("NYCRR"). NYCRR § 1200.21 provides in pertinent part:

> (c) If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that the lawyer ought to be called as a witness on a significant issue on behalf of the client, the lawyer shall not serve as an advocate on issues of fact before the tribunal . . .

> (d) If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that the lawyer or a lawyer in his firm may be called as a witness on a significant issue other than on behalf of the client, the lawyer may continue the representation until it is apparent that the testimony is or may be prejudicial to the client, at which point the lawyer and the firm must withdraw from acting as an advocate before the tribunal.

In considering disqualification motions, courts apply these standards objectively. The cases are necessarily fact specific. The test under subparagraph (c) "is whether the attorney's testimony could be significantly useful to his client. If so, he should be disqualified *regardless of whether he will actually be called*." *Lamborn v. Dittmer*, 873 F.2d 522, 531 (2d Cir. 1989) (emphasis added). Subparagraph (d) "comes into play where a lawyer's testimony would contradict or undermine his

client's factual assertions." *Id.*[7]

It is clear that under either test, Farelli and Pryor Cashman must be disqualified as counsel for the Union defendants. The dispositive factual issue in plaintiffs' claim that the Union breached the duty of fair representation is whether the Union's failure or refusal to lodge a grievance on behalf of the Hotel doormen and bellmen is "arbitrary" or "in bad faith"; that conduct is arbitrary if "in light of the factual and legal landscape at the time of the union's actions [or inaction], the union's behavior is so far outside a wide range of reasonableness as to be irrational." *Sanozsky*, 415 F.3d at 282-83. I intimate no view as to how that issue should be decided, but obviously Farelli is a vital fact witness with respect to it. In their effort to persuade the factfinders that the Union acted arbitrarily, plaintiffs must establish the "legal landscape" at the time of the Union's actions, and Farelli is the dominant figure on that landscape. He was the only lawyer present at the significant August 17 meeting involving certain employees and Union officers. At that meeting Farelli collected information from Corona, Bishop and Hickey and dispensed preliminary legal advice. Of at least equal significance, Farelli authored the August 31 memorandum to Simo, recommending that the Union file a grievance on behalf of its members and seek an expedited hearing. Plaintiffs need and are entitled to Farelli's testimony on these facts and related issues, including post-August 31 events known to Farelli that might explain the Union's failure or refusal to file a grievance. It is certainly conceivable that Farelli's testimony "would contradict or undermine his client's factual assertions," *Lamborn*, 873 F.2d at 531, the precise circumstance, as *Lamborn* holds, that requires an attorney's disqualification. The converse proposition also applies. Farelli is uniquely positioned to give testimony "significantly useful to his client," *id.*, on the issue of whether the Union acted arbitrarily.

---

[7] The quotations from *Lamborn v. Dittmer* in text discussed subparagraphs (A) and (B) of the Code's Disciplinary Rule 5-102, whose language is replicated in NYCRR § 1200.21.

As the Code provides and *Lamborn* also holds, that circumstance also requires Farelli's disqualification.  And it is no answer for the Union to say that it would not call Farelli as a witness on its behalf; as noted, the test is objective and a client may not evade the Code's ethical standards by refraining from calling a witness who the realities of the case make plain should be called.

The Union defendants argue that Farelli is not a necessary witness because others could testify to the same facts.  There is no substance to the argument.  To be sure, Corona, Bishop, and Hickey are available to describe the events at the August 17 meeting as they recall them and from plaintiffs' perspective, and Pasquale and Simo are available to give comparable testimony on behalf of the Union.  But these are all interested witnesses, plaintiffs in the litigation[8] or officers of defendants, possible preys to the temptations of selective memory and "spun" testimony.  While Farelli, an associate of a law firm which frequently represents the Union, is perhaps not one's *beau ideal* of the non-party, disinterested witness, he comes closer to fulfilling that role than anyone else, and as an attorney and officer of the Court, one may presumably rely upon him to give a truthful account to the factfinders.  Moreover, as noted *supra*, Farelli is the only witness to these events who is an attorney, and consequently uniquely qualified to paint that legal landscape which lies at the heart of the plaintiffs' case against the Union.[9]

---

[8]  Hickey is not a party plaintiff.  Corona and Bishop are.  The distinction does not affect the analysis in the accompanying text.

[9]  As plaintiffs note in their papers, pretrial discovery may reveal the necessity to take testimony from other Pryor Cashman attorneys.  That possibility is not presently before the Court.  Neither is the question of attorney-client privilege, but it is useful in that regard to note that only a client's communications to its attorney are privileged.  An attorney's communications to the client are not privileged unless they reveal the substance of the client's communications to the attorney for the purpose of obtaining legal advice.  As the case goes forward, any assertion by the Union of its attorney-client privilege (which belongs to the client alone) will be evaluated by the content of the particular communication in the light of these principles.  In any event, Farelli's declarations at the August 17 meeting could not be privileged because they were made in the presence of third parties.

I conclude therefore, without difficulty, that Farelli must be disqualified as the Union's attorney. It is equally clear that Pryor Cashman must also be disqualified. As I have held, plaintiffs are entitled to call Farelli as a trial witness on their case in chief. Farelli would then be cross-examined[10] by an attorney from Pryor Cashman, in all likelihood a partner, which would place Farelli, an associate of the Firm, in a position so professionally uncomfortable that it cannot be countenanced under the Code. That circumstance is sufficient to disqualify the Firm, even assuming (which is far from certain) that no other Pryor Cashman lawyer should be called as a witness.

### III. CONCLUSION

For the foregoing reasons, Joseph Farelli, Esq., and the Firm of Pryor Cashman Sherman & Flynn LLP are disqualified from acting as attorneys for the Union in this case.

The Union is directed to cause successor counsel to enter and serve a notice of appearance not later than September 30, 2005. Successor counsel are directed, on or before that date, to file and serve additional or different papers in support of the Union's pending motion to dismiss the complaint, or to write the Court a letter, with copies to other counsel of record, advising that they do not wish to do so, in which event the motion will be adjudicated on the basis of the present submissions. whether they wish to submit other or different papers in support of the Union's pending motion to dismiss the plaintiffs' complaint. While the Union's present attorneys must be, and are, disqualified from the case, the circumstances requiring disqualification would not appear to taint the briefs and arguments previously made on the dismissal motion.

---

[10] I use that formal phrase although plaintiffs would probably be entitled to examine Farelli as a hostile witness, thereby reversing the traditional sequence of direct and cross examination.

It is SO ORDERED.

Dated:  New York, New York
        August 29, 2005

                        _____
                        CHARLES S. HAIGHT, JR.
                        SENIOR UNITED STATES DISTRICT JUDGE